[Cite as *State v. Bevins*, 2026-Ohio-2522.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | : | Case No. 24CA4105 |
| Plaintiff-Appellee, | : | |
| | : | |
| v. | : | |
| | : | DECISION AND JUDGMENT |
| BRANDI A. BEVINS, | : | ENTRY |
| | : | |
| Defendant-Appellant. | : | |
| | : | |

_____

APPEARANCES:

Brian T. Goldberg, Cincinnati, Ohio, for appellant.

Shane A. Tieman, Scioto County Prosecuting Attorney, and Jay Willis, Assistant Scioto County Prosecuting Attorney, Portsmouth, Ohio, for appellee.

_____

Smith, P.J.

{¶1} Appellant, Brandi A. Bevins, appeals the judgment of the Scioto County Court of Common Pleas convicting her of two counts of aggravated trafficking in drugs, trafficking in cocaine, and trafficking in a fentanyl-related compound. On appeal, appellant contends 1) that her convictions were not supported by sufficient evidence and are against the manifest weight of the evidence and 2) that the trial court erred by improperly sentencing her to

consecutive prison terms.  However, because we find no merit to her assignments of error, the judgment of the trial court is affirmed.

FACTS

**{¶2}** On September 13, 2023 law enforcement used a confidential informant to successfully conduct a controlled buy at a Campbell Avenue residence in Portsmouth.  The next day, in addition to conducting surveillance on the Campbell Avenue residence, law enforcement executed a search warrant during which a large amount of suspected drugs, drug trafficking material, and drug paraphernalia were located throughout the residence.  Present at the time of the execution of the warrant were the residents, appellant and Johnny Fitzpatrick.  Also present were Michael Lewis and Tony Walker, residents of Dayton.

**{¶3}** On October 3, 2023, appellant, Fitzpatrick, Lewis, and Walker were indicted on nine counts, with counts one and two occurring on September 13, 2023, and counts three through nine occurring on September 14, 2023:

Count 1:  aggravated trafficking in drugs in violation of R.C. 2925.03(A)(1) and R.C. 2925.03(C)(1)(d), a second-degree felony;

Count 2:  aggravated possession of drugs in violation of R.C. 2925.11(A) and R.C. 2911(C)(1)(c), a second-degree felony;

Count 3:  aggravated trafficking of drugs in violation of R.C. 2925.03(A)(2) and R.C. 2925.03(C)(1)(d), a second-degree felony;

Count 4: aggravated possession of drugs in violation of R.C. 2925.11(A) and R.C. 2925.11(C)(1)(c), a second-degree felony;

Count 5: tampering with evidence in violation of R.C. 2921.12(A)(1) and R.C. 2921.12(B), a third-degree felony;

Count 6: trafficking in cocaine in violation R.C. 2925.03(A)(2) and R.C. 2925.03(C)(4)(f), a first-degree felony;

Count 7: possession of cocaine in violation of R.C. 2925.11(A) and R.C. 2925.11(C)(4)(e), a first-degree felony;

Count 8: trafficking in a fentanyl-related compound in violation of R.C. 2925.03(A)(2) and R.C. 2925.03(C)(9)(f), a first-degree felony; and

Count 9: possession of a fentanyl-related compound in violation of R.C. 2925.11(A) and R.C. 2925.11(C)(11)(e), a first-degree felony.

The indictment also contained a forfeiture specification for counts three, six, seven, eight, and nine for $2,355 in cash. Prior to trial, counts six and seven were amended to second-degree felonies.

{¶4} Appellant entered a not guilty plea and was tried before a jury along with co-defendant Fitzpatrick on September 16, 2024. At the trial, the State adduced evidence that the Southern Ohio Drug Task Force ("SODTF") conducted a controlled buy at the Campbell Avenue residence using a confidential informant. This confidential informant had purchased drugs at the same Campbell Avenue residence three or four times before. On September 13, 2023, the confidential

informant entered the Campbell Avenue residence with buy money and a recording device provided by the SODTF and purchased what later tested as 29.23 grams of methamphetamine from Lewis.

{¶5} The SODTF had received information that there were large amounts of drugs being sold at the Campbell Avenue residence, and also that people were seen coming and going from the residence. As the SODTF members and other witnesses described, the Campbell Avenue residence had the markings of a "trap house." A "trap house" is a place where the primary resident has allowed various people to enter a residence for some benefit and the house then becomes a place for selling, using, and stashing drugs – a sort of "convenience store" for drug activity. The confidential informant who testified agreed that the Campbell Avenue residence would be characterized as a "trap house."

{¶6} The SODTF obtained a search warrant for the Campbell Avenue residence, a shotgun-style, single-family dwelling. On September 14, 2023, members of the SODTF began surveilling the residence about 7:00 a.m. and they executed the search warrant at 10:30 a.m. When entering the residence, SODTF realized from the design of the home, someone in the rear bedroom could see what was going on in the front room, and vice versa. The house had debris and trash throughout. In the kitchen, the SODTF saw Lewis. From the kitchen, they could also see Fitzpatrick seated on a chair in the living room. The SODTF found large

amounts of a crystal-like substance (methamphetamine or its byproduct) scattered all over the floor in the living room.  In fact, the drugs were so apparent that members of the SODTF did not have to get on their hands and knees to see them.  The methamphetamine in the living room was spread around Fitzpatrick and on his person.

{¶7} The SODTF found Walker and appellant in the front room of the residence.  They also found methamphetamine on the floor around where appellant was located, but not on her person.  The SODTF found syringes and a spoon near appellant.

{¶8} In addition to the drugs seen out in the open throughout the house, law enforcement saw drug paraphernalia including syringes, bindles (papers used to package drugs), digital scales, a razorblade and credit card used for cutting and packaging drugs, cell phones, a bag full of numerous empty clear plastic capsules used for drug trafficking, baggies, and a large amount of lottery tickets folded into bindles.  Law enforcement found large amount of the bindles in both the living room and front room located near appellant and Fitzpatrick.  Law enforcement also found a torn plastic baggie in the room where Fitzpatrick was.  In addition, law enforcement found a large amount of cash in excess of $2,300 on Lewis, including marked money from the controlled buy the day before.

{¶9} During the search, Fitzpatrick said he resided there at the Campbell Avenue house. In addition, in an interview with law enforcement, appellant said she had been living at the Campbell Avenue residence for approximately five months prior to the date of the search, that she had been dating Fitzpatrick for about three months prior to the search, and that both had resided at the Campbell Avenue residence. Appellant claimed that Lewis had initially pushed his way in the house at Campbell Avenue to sell drugs. However, testimony revealed that law enforcement received no calls that drug dealers pushed their way into appellant's home. Later, Appellant admitted that she had agreed to let Lewis stay there if he would pay the water bill. She claimed that she had received no money from Lewis because he had only arrived two days prior to the execution of the search warrant.

{¶10} Appellant also said that when Lewis arrived, he had three softball-sized bags of drugs, which the SODTF explained was a large amount of drugs. Appellant also said that a week prior to the search warrant Lewis sent his sister and a male named "DJ" to the Campbell Avenue residence to trap and sell drugs for a few days. Appellant also said that when Lewis arrived, he sent text messages out to multiple individuals offering up free "testers" of drugs. Those free "testers" were in small, folded lottery tickets containing a tenth of a gram of drugs. Lewis would sometimes give people free testers and sent multiple text messages out that he had free testers, and to come to the residence. The SODTF explained that this

was Lewis' attempt to build a client base.  Appellant also said that Walker was Lewis' "assistant."  During the search, the SODTF members observed appellant, Lewis, and Walker speaking to one another, back and forth.

{¶11} At trial, Detective Metzler of the SODTF explained the course and scope of drug trafficking that the task force investigates.  In particular, Metzler described a source city where the drug originates (like Dayton, where Lewis and Taylor were from) being shipped to the destination city (like Portsmouth) where it is sold and used.  Metzler described the need for the task force to use confidential informants to stop distribution and sale.  In addition, Metzler described the street terminology for various drugs and their appearance.  Finally, Metzler explained that the "user amounts" of drugs are those in the range of a gram or two.  However, due to the expense of the drugs, the task force sees drugs in the amounts of quarter pounds to pounds in the possession of those who are trafficking.

{¶12} In addition to testimony from the confidential informant and members of the SODTF, the State also called to testify a male drug purchaser whose drugs of choice were cocaine and fentanyl.  This drug purchaser testified he had purchased drugs from Lewis at the Campbell Avenue residence before ("a half-dozen times"), which the drug purchaser would describe as a "trap house."  This drug purchaser testified that Lewis gave out "free testers."

{¶13} The day of the search, the drug purchaser received a text from Lewis to come get a "test product" of cocaine and fentanyl at the residence. This drug purchaser went to get the product that day and testified that the people who lived in the Campbell Avenue residence were there when he smoked crack cocaine and injected fentanyl in the house, although he did not get the drugs off the residents. Another black male was also there. This drug purchaser said that fentanyl and cocaine were out in the open and being sold there. This drug purchaser testified that on the day of the search the SODTF came while he was there.

{¶14} Further, the SODTF members testified that a female drug purchaser showed up during the search warrant with $10 on her person. This amount is enough to purchase a bindle of meth, which is the going rate for a tenth of a gram.

{¶15} The State presented testimony from the BCI Crime Lab forensic scientist regarding the identity and amounts of the following substances seized the day of the search: xylazine and fentanyl - less than .1 gram; methamphetamine - 9.09 grams; methamphetamine - 20.11 grams; cocaine - 7.77 grams; cocaine - 13.18 grams; methamphetamine - 7.85 grams; xylazine and fentanyl - 1.48 grams; xylazine and fentanyl - 1.78 grams; xylazine and fentanyl - 2.44 grams; xylazine and fentanyl - 14.22 grams; xylazine and fentanyl - .41 grams; methamphetamine - 1.23 grams; and methamphetamine - 5.8 grams. Some of these items were in separate paper folded lottery tickets (bindles) as if packaged for individual sale.

{¶16} At the close of evidence in the State's case, appellant and Fitzpatrick moved for Crim.R. 29 acquittal. Appellant made a general argument. Fitzpatrick argued that the State had shown that Lewis was trafficking. Fitzpatrick contended, however, that he was not complicit in the activities of Lewis. The trial court overruled the motions. During closing arguments, the State suggested that appellant and Fitzpatrick were guilty of trafficking under a complicity theory.

{¶17} The jury found appellant not guilty of tampering with evidence (count five), but guilty of all other counts. The trial court merged certain counts, and the State made election of offenses for sentencing. Ultimately, appellant was convicted of counts one, three, six, and eight – the trafficking counts. For these offenses, appellant was sentenced to two years on count one; four years on count three; four years on count six; and five to seven and a half years on count eight. The trial court ordered all prison sentences to be served consecutively for a total prison term of 15-17.5 years in prison. Appellant submitted a timely notice of appeal and raises two assignments of error.

ASSIGNMENTS OF ERROR

I. MS. BEVINS' CONVICTIONS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND ARE CONTRARY TO THE MANIFEST WEIGHT OF EVIDENCE.

II. THE TRIAL COURT ERRED TO THE PREJUDICE OF MS. BEVINS BY IMPROPERLY SENTENCING HER TO CONSECUTIVE PRISON TERMS.

ASSIGNMENT OF ERROR OF I

{¶18} In her first assignment of error, appellant contends that her convictions were not supported by sufficient evidence and were against the manifest weight of the evidence.  Appellant contends that as to the controlled buy that occurred on September 13, she had no involvement whatsoever even though the drugs were purchased at the Campbell Avenue residence, because she cannot be seen on the video of the controlled buy and the confidential informant did not testify that appellant was present during the buy.  She further avers that the mere offering of her home for the selling of drugs is not sufficient for a conviction of trafficking.  She also asserts she was not guilty of possession or drug trafficking the following day, when the search warrant was executed, because she did not constructively possess the drugs and the drugs were not found on her person.

{¶19} The State counters that the evidence was sufficient and the convictions were not against the manifest weight because appellant was not merely present in the home, but an active participant in the offenses.  The State points out that the task force found crystal methamphetamine and other drugs throughout the house.

Further, Bevins provided a statement that she knew Lewis had shown up with a large amount of drugs to sell out of the residence, for which she received an economic benefit of Lewis offering to pay the water bill. Further, the State claims that appellant was present during drug transactions at various times and clearly had knowledge the drugs were being sold and used there.

Standard of Review

{¶20} Because appellant challenges both the sufficiency of the evidence and the manifest weight of the evidence, we initially set forth both standards of review.

{¶21} A claim of insufficient evidence invokes a due process concern and raises the question of whether the evidence is legally sufficient to support the verdict as a matter of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), syllabus; *State v. Blevins*, 2019-Ohio-2744, ¶ 18 (4th Dist.). When reviewing the sufficiency of the evidence, an appellate court's inquiry focuses primarily on the adequacy of the evidence; that is, whether the evidence, if believed, could reasonably support a finding of guilt beyond a reasonable doubt. *Id.* at syllabus. The standard of review is whether, after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. *E.g., Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991).

**{¶22}** Furthermore, under the sufficiency of the evidence standard, a reviewing court does not assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *Thompkins*, *supra*, at 390 (Cook, J., concurring). Therefore, when reviewing a sufficiency of the evidence claim, an appellate court must construe the evidence in a light most favorable to the prosecution. *See, e.g., State v. Hill*, 75 Ohio St.3d 195, 205 (1996); *State v. Grant*, 67 Ohio St.3d 465, 477 (1993). A reviewing court will not overturn a conviction on a sufficiency of the evidence claim unless reasonable minds could not reach the conclusion the trier of fact did. *State v. Tibbetts*, 92 Ohio St.3d 146, 162 (2001); *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

**{¶23}** "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence." *Thompkins*, *supra*, at 387. "The question to be answered when a manifest weight issue is raised is whether 'there is substantial evidence upon which a jury could reasonably conclude that all the elements have been proved beyond a reasonable doubt.' " *State v. Leonard*, 2004-Ohio-6235, ¶ 81, quoting *State v. Getsy*, 84 Ohio St.3d 180, 193-194 (1998), citing *State v. Eley*, 56 Ohio St.2d 169 (1978), syllabus. A court that considers a manifest weight challenge must " 'review the entire record, weigh the evidence and

all reasonable inferences, and consider the credibility of witnesses.' " *State v. Beasley*, 2018-Ohio-493, ¶ 208, quoting *State v. McKelton*, 2016-Ohio-5735, ¶ 328. However, the reviewing court must bear in mind that credibility generally is an issue for the trier of fact to resolve. *State v. Issa*, 93 Ohio St.3d 49, 67 (2001); *State v. Murphy*, 2008-Ohio-1744, ¶ 31 (4th Dist.). " 'Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility.' " *Barberton v. Jenney*, 2010-Ohio-2420, ¶ 20, quoting *State v. Konya*, 2006-Ohio-6312, ¶ 6 (2d Dist.), in turn quoting *State v. Lawson*, 1997 WL 476684 (2d Dist. Aug. 22, 1997).

{¶24} Thus, an appellate court will generally defer to the trier of fact on evidence weight and credibility issues, as long as a rational basis exists in the record for the fact-finder's determination. *State v. Picklesimer*, 2012-Ohio-1282, ¶ 24 (4th Dist.); *accord State v. Howard*, 2007-Ohio-6331, ¶ 6 (4th Dist.) ("We will not intercede as long as the trier of fact has some factual and rational basis for its determination of credibility and weight."). Accordingly, if the prosecution presented substantial credible evidence upon which the trier of fact reasonably could conclude, beyond a reasonable doubt, that the essential elements of the offense had been established, the judgment of conviction is not against the manifest weight of the evidence. Accord *Eastley v. Volkman*, 2012-Ohio-2179, ¶

12, quoting *Thompkins, supra*, at 387, quoting Black's Law Dictionary 1594 (6th Ed.1990) (a judgment is not against the manifest weight of the evidence when " ' "the greater amount of credible evidence" ' " supports it).

**{¶25}** Consequently, when a court reviews a manifest weight of the evidence claim, a court may reverse a judgment of conviction only if it appears that the fact-finder, when it resolved the conflicts in evidence, " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins, supra*, at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983); *accord McKelton* at ¶ 328. Finally, a reviewing court should find a conviction against the manifest weight of the evidence only in the " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins, supra*, at 387, quoting *Martin*, *supra*, at 175; *accord State v. Clinton*, 2017-Ohio-9423, ¶ 166; *State v. Lindsey*, 87 Ohio St.3d 479, 483 (2000).

Legal Analysis

**{¶26}** At the outset, we observe that although the jury found appellant guilty of trafficking and possession, the trial court merged the possession counts with the trafficking counts. Thus, if sufficient evidence supports appellant's trafficking convictions, an erroneous verdict on the merged counts would be harmless. *See State v. Foster,* 2023-Ohio-746, ¶ 22 (4th Dist.); *State v. Whitehead,* 2022-Ohio-

479, ¶ 78 (4th Dist.); *State v. Worley,* 2021-Ohio-2207, ¶ 73; *see also State v. Williams*, 2012-Ohio-4693, ¶ 54 (4th Dist.) (because court does not impose sentence for merged offenses, defendant is not "convicted" of merged offenses and thus, there is no "conviction" for appellate court to vacate).  Consequently, if we determine that sufficient evidence supports appellant's trafficking convictions, we need not address her sufficiency argument regarding the possession offenses.

{¶27} In addition, we acknowledge that for each of the drug offense counts the State was required to prove the identity and amount of drugs recovered. However, appellant does not take issue with these elements.  Appellant's arguments focus solely on whether she was complicit in the trafficking of the drugs themselves, as the State alleged at trial.  We therefore limit our discussion accordingly.

September 13, 2023 - Count One

{¶28} Count one of the indictment alleges that appellant committed aggravated trafficking in drugs, pursuant to R.C. 2925.03(A)(1) and (C)(1)(d). Relevant to our discussion, R.C. 2925.03(A)(1) provides:  "[n]o person shall knowingly * * * sell or offer to sell a controlled substance or a controlled substance analog."  R.C. 2901.22(B) defines the culpable state of "knowingly:

> A person acts knowingly, regardless of purpose, when the person
> is aware that the person's conduct will probably cause a certain
> result or will probably be of a certain nature. A person has
> knowledge of circumstances when the person is aware that such

circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

**{¶29}** R.C. 2923.03(A)(2) states that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense." " 'A conviction for aiding and abetting under R.C. 2923.03(A)(2) requires the state to prove, beyond a reasonable doubt, "that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." ' " *State v. Crumpton,* 2024-Ohio-5064, ¶ 30 (4th Dist.), quoting *State v. Smith*, 2022-Ohio-371, ¶ 53 (4th Dist.), quoting *State v. Johnson*, 93 Ohio St.3d 240 (2001), syllabus. " ' "Participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed." ' " *Id.,* quoting *Johnson* at 245, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34 (4th Dist. 1971). Yet, " ' "the mere presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor." ' " *Id.,* quoting *Johnson* at 243, quoting *State v. Widner*, 69 Ohio St.2d 267, 269 (1982). " 'This rule is to protect innocent bystanders who have no connection to the crime other than simply being present at the time of its commission.' " *Id.*

**{¶30}** Further, "[a] person's mere association with a principal offender is not enough to sustain a conviction based on aiding and abetting; there must be some level of active participation by way of providing assistance or encouragement." *State v. Anderson,* 2009-Ohio-2521, ¶ 25 (12th Dist.), citing *State v. Mootispaw*, 110 Ohio App.3d 566, 570 (4th Dist. 1996). "Criminal intent, however, can be inferred from the presence, companionship and conduct of a criminal defendant both before and after the offense is committed and may be proven by either direct or circumstantial evidence." *Id.,* citing *Mootispaw* at 570, citing *State v. McKnight,* 2002-Ohio-1971, ¶ 23 (4th Dist.).

**{¶31}** " 'We further observe that the complicity statute does not require the state to charge the defendant with complicity.' " *Crumpton,* 2024-Ohio-5064, ¶ 31 (4th Dist.), quoting *Smith* at ¶ 54. " 'Instead, R.C. 2923.03(F) allows the state to charge the defendant as a principal offender: "[a] charge of complicity may be stated in terms of [the complicity statute], or in terms of the principal offense." ' " (Bracketed material in original.) *Id.*, quoting R.C. 2923.03(F).

**{¶32}** The State presented testimony that this offense occurred on September 13, 2023 at 408 Campbell Avenue, when Lewis sold approximately 29 grams (roughly an ounce) of methamphetamine. Appellant's residence was 408 Campell Avenue, a trap house, where large amounts of drugs were being sold and people were coming and going at different times. It was the base of operation for the

drugs sales, or a "convenience store" for drugs where a large amount of drugs were found and stored. The confidential informant and the officers described the buy at trial, and video evidence supported their testimony. While it is true that appellant is not seen on the buy video, nor did the confidential informant testify to her presence during that specific buy, it is also clear that she knew full well that Lewis was selling drugs from her residence. She cooperated and encouraged Lewis by entering an agreement with him for which she received a benefit (him agreeing to pay the water bill). Circumstantial evidence obtained during the execution of the search warrant also supports the jury's finding of guilt because drugs and drug paraphernalia (syringes and spoon which were signs of drug abuse) were found in the area of appellant, from which the jury could have concluded that appellant also received a benefit of drugs as part of the payment for allowing Lewis to sell out of the home.

{¶33} Rather than mere association with Lewis, appellant clearly had the culpability of the principal of the count one trafficking offense. Appellant told law enforcement that when Lewis arrived at her home, he had three softball-size bags of drugs, and that Lewis had sold drugs at her house within at least the past week. Appellant also said she knew he sent out "testers" or samples out to drug users. Evidence at the trial showed that both before and during the execution of the search warrant, at least two other people in addition to the confidential informant

either purchased or attempted to purchase drugs from that location when appellant

was present. In fact, a purchase was made by a user who injected fentanyl and

smoked crack cocaine in the residence while the residents were there the next day.

Thus, the State presented concrete evidence of three persons who had purchased or

attempted to purchase drugs at the Campbell Avenue residence, and also that at

least some of the persons may have been at the residence multiple times to

purchase drugs.

{¶34} In her argument, appellant cites two cases in particular where

appellate courts have vacated convictions for complicity to drug trafficking. The

first is *State v. Jordan*, 2006-Ohio-538 (8th Dist.). In *Jordan*, the appellate court

observed that "there must be some evidence demonstrating that [the defendant]

took an active role in the drug transaction." *Jordan* at ¶ 11. *Jordan* involved a

purchase from a confidential informant at a public convenience store. In *Jordan*, a

law enforcement officer testified that he dropped off the confidential informant,

who had a brief conversation with Jordan. After this brief conversation, Jordan

and the confidential informant exited the store and approached a male standing

outside from whom the confidential informant purchased the drugs while Jordan

was merely "standing there." *Id.* In *Jordan*, the state presented no evidence of

what the confidential informant and Jordan discussed in the store, nor that Jordan

was a lookout of some sort. As a result, the appellate court found whether Jordan was complicit in the transaction was "mere speculation." *Jordan* at ¶ 12.

{¶35} The appellant also cites *State v. Ricks,* 2011-Ohio-5043 (6th Dist.), in support of her argument. In *Ricks,* the defendant was merely present during the crime, and nothing existed to connect the defendant to the drugs or participating in the setting up of the drug transaction.

{¶36} We find these cases to be inapposite. The State established that the principal actor involving count one was Lewis, who was from the Dayton area, which is a source city. The task force members also explained the course of trafficking where members from a source city seek out persons of a destination city (Portsmouth) to sell drugs. Appellant clearly provided a place in Portsmouth, described as a type of "convenience store," where Lewis could sell the drugs. In addition to providing the place to sell drugs, it is clear the drugs were kept there. Appellant admitted she had agreed to allow the sale of drugs from her residence in exchange for Lewis' promise to pay the water bill. Further, there is at least some circumstantial evidence she also received a benefit by using the drugs as well. She admitted that she knew about Lewis selling from the home "a couple days before" and others selling drugs a week prior. Additionally, while the controlled buy occurred on September 13, the evidence obtained during the search warrant and the testimony from the confidential informant and drug purchaser constitute significant

evidence that appellant knew about and participated in the controlled buy of September 13.

**{¶37}** Appellate courts have held that the providing of a place to sell and store drugs is sufficient involvement for a drug trafficking conviction. *See, e.g., State v. Reid*, 2012-Oho-5124, ¶ 41-42 (11th Dist.) (defendant guilty of drug trafficking when he rented the house where drug sale took place and police later recovered the drugs packaged for sale); *State v. Kidd*, 2007-Ohio-4113, ¶ 54 (11th Dist.) (where court held complicity instruction was proper because "[i]f for the sake of argument, [defendant's] role in these activities were nothing more than allowing them to occur in the apartment, she could be found guilty of complicity"); *State v. Scott*, 2007-Ohio-303, ¶ 36-42 (5th Dist.) (complicity convictions supported by sufficient evidence where drug buys occurred at [the defendant's] residence and drugs, paraphernalia, and firearms were found in her bedroom). Thus, even though the confidential informant did not see the appellant on the day he purchased the drugs, the manifest weight of the evidence supports the jury's finding that appellant was complicit in the September 13 controlled buy.

September 14, 2023 - Counts Three, Six and Eight

**{¶38}** Similarly, there is also substantial evidence that appellant is guilty of counts three, six, and eight, under a complicity theory, even though appellant argues there is insufficient evidence that she constructively possessed the drugs.

Appellant's convictions related to these counts involve drug trafficking under R.C. 2925.03(A)(2). The definition of drug trafficking under R.C. 2925.03(A)(2). R.C. 2925.03(A)(2) states: "[n]o person shall knowingly * * * [p]repare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance or a controlled substance analog, when the offender knows or has reasonable cause to believe that the controlled substance or a controlled substance analog is intended for sale or resale by the offender or another person."

{¶39} Ohio courts have held that a drug trafficking conviction under a complicity theory does *not* require that the accomplice offender possess the drugs, as long as the state proves the principal offender possessed the drugs incident to the trafficking. *See e.g.*, *State v. McGowan,* 2005-Ohio-1335 ¶ 18-22 (7th Dist.) (conviction upheld where the defendant provided transportation to facilitate a drug sale, even though he never possessed the drugs); *State v. Wilcoxen,* 2003-Ohio-6061, ¶ 13 (2d Dist.) (evidence sufficient for drug trafficking under a complicity theory where defendant permitted the principal offender to carry on the drug sales from her home and shared in the proceeds of the sale); *State v. Peavy,* 2002-Ohio-5067, ¶ 11, 27 (8th Dist.) (where court upheld a conviction for trafficking when defendant acted as a lookout and was complicit to the drug trafficking even though he himself did not possess the drugs).

**{¶40}** Ample evidence shows appellant was an accomplice to Lewis in the drug trafficking offenses related to the September 14, 2023 search warrant. Not only was she present during the sale to the male drug purchaser that day as well as when the female potential buyer showed up, she clearly provided her trap house residence for the transaction. She also received a benefit from providing her residence.

**{¶41}** " 'To sustain an R.C. 2925.03(A)(2) trafficking conviction as a *principal* offender, the state must prove that a defendant had control over, *i.e.*, possessed, the illegal substance.' " *State v. Crumpton,* 2024-Ohio-5064, ¶ 32 (4th Dist.) (Emphasis added.), quoting *State v. Smith*, 2022-Ohio-371, ¶ 59 (4th Dist.), citing *State v. Cabrales*, 2008-Ohio-1625, ¶ 30. In the instant case, the State presented a large amount of evidence that Lewis, the principal, possessed the drugs. In contrast, the State presented evidence that appellant was an accomplice, and not the principal of the drug trafficking offenses. However, even if she was required to possess the drugs related to search warrant trafficking counts, we still find that she constructively possessed the drugs, contra to appellant's argument on appeal.

**{¶42}** Possession "means having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is

found." R.C. 2925.01(K). " 'Constructive possession exists when an individual knowingly exercises dominion and control over an object, even though that object may not be within his immediate physical possession.' " *State v. Carr,* 2025-Ohio-2583, ¶ 27 (4th Dist.), quoting *State v. Hankerson,* 70 Ohio St.2d 87, (1982), syllabus. "For constructive possession to exist, the state must show that the defendant was conscious of the object's presence." *Id.,* citing *Hankerson,* 70 Ohio St.2d at 91; *State v. Kingsland*, 2008-Ohio-4148, ¶ 13 (4th Dist.). "Both dominion and control, and whether a person was conscious of the object's presence, may be established through circumstantial evidence." *Carr* at ¶ 28, citing *State v. Foster,* 2023-Ohio-746, ¶ 27 (4th Dist.), and *State v. Brown*, 2009-Ohio-5390, ¶ 19 (4th Dist.).

{¶43} " 'Furthermore, to establish constructive possession the state need not show that the defendant had "[e]xclusive control" over the contraband.' " *Carr* at ¶ 29, quoting *State v. Whitehead,* 2020-Ohio-479, ¶ 91 (4th Dist.), quoting *State v. Tyler,* 2013-Ohio-5242, ¶ 24 (8th Dist.). Additionally, "[m]ultiple persons may have joint constructive possession of an object." *Id.,* citing *State v. Philpott,* 2020-Ohio-5267, ¶ 67 (8th Dist.); *State v. Wolery,* 46 Ohio St.2d 316, 332-329 ("[p]ossession * * * may be individual or joint" and "control or dominion may be achieved through the instrumentality of another"). Further, "[a]lthough a defendant's mere proximity is in itself insufficient to establish constructive

possession, proximity to the object may constitute some evidence of constructive possession." *State v. Price-Tuggle,* 2026-Ohio-1027,¶ 43 (4th Dist.), citing *State v. Fry*, 2004-Ohio-5747, ¶ 40 (4th Dist.).  Thus, " 'presence in the vicinity of contraband, coupled with another factor or factors probative of dominion or control over the contraband, may establish constructive possession.' " *Id.,* quoting *Kingsland*, 2008-Ohio-4148, ¶ 13 (4th Dist.).

**{¶44}** Here, while drugs were not found on appellant's person, they were found in the room where she was sitting and drug paraphernalia was also found close by.  In the front room, as well as living room, the task force found a crystal-like substance on the floor.  Not only were large quantities of various drugs found throughout the home where she resided and from where she provided permission to sell drugs, but drugs were found in the small room where she was located, some of which were wrapped for individual sale.  In addition, these drugs were found in the common areas of the small residence sitting out in plain view.  The testimony showed that one could see the drugs and actions of others in the home from one end of the residence to another.  Appellant through her own admission had knowledge of the drugs and their sale.  Thus, it is clear that she constructively possessed the drugs even though they were not found directly on her person.

**{¶45}** Further, there is ample evidence that she was engaged in trafficking drugs.  The amounts of the drugs found is circumstantial evidence of drug

trafficking, because "possession of a large quantity of narcotics is commonly recognized as significant circumstantial evidence of intent to distribute in narcotics." *State v. Robison*, 2026-Ohio-1223, ¶ 34 (4th Dist.), citing 1 Wharton's Criminal Evidence § 3:5 (15th ed.). "Possession of a large quantity of drugs, large amounts of cash, plastic baggies, and scales, among other indicia of trafficking, provide persuasive circumstantial evidence that tends to prove a violation of R.C. 2925.03(A)(2)." *State v. Birdsong*, 2024-Ohio-1744, ¶ 43 (11th Dist.), citing *State v. Floyd*, 2019-Ohio-4878, ¶ 32 (7th Dist.). In addition to the drug paraphernalia, individually packaged drugs, and drugs on the floor of the front room, in other areas of the house there were two scales, cell phones, credit cards and razorblade for cutting drugs, lotto tickets used to bindle the drugs for individual sale, and a large amount of money found on Lewis in the kitchen. "It has long been established that otherwise innocuous objects such as bags, money, or cell phones can be used as criminal tools in drug trafficking and these items may constitute circumstantial evidence for drug trafficking." *State v. Cobb,* 2024-Ohio-458, ¶ 17 (8th Dist.), citing *State v. Hawthorne*, 2016-Ohio-203, ¶ 21 (8th Dist.), citing *State v. Bowling*, 2010-Ohio-3595, ¶ 60 (8th Dist.). Accordingly, while some of these items could be typical household items, in this instance, they were not. The task force also found multiple empty drug capsules in the bathroom of the residence in a cabinet.

{¶46} Moreover, the State adduced testimony that at least three individuals had attempted or had bought drugs at the residence (conclusively twice when appellant was there), as well as testimony from witnesses that the residence was a "trap house." During trial the confidential informant said he had been to the house to purchase drugs three or four times, the male drug user said he had been there a half dozen times, and then another female drug purchaser showed up the day of the search. Additionally, what can be gleaned from appellant's own statement is that more than one person was selling drugs from the Campbell Avenue residence. Task force members also explained to the jury the drug trafficking trade and such things as what would constitute personal use amounts for drugs, versus amounts found in trafficking operations.

{¶47} In sum, our review of the record shows that the State presented ample credible evidence to sustain the convictions. We do not believe that the evidence weighs heavily against appellant's convictions, under a theory of complicity for count one and clearly under a theory of complicity for counts three, six, and eight. Even if she was required to actually possess the drugs as an accomplice as to counts three, six and eight, she constructively possessed a large amount of the drugs, and some of those drugs which were packaged for individual sale were found close near her. We therefore overrule appellant's first assignment of error.

## ASSIGNMENT OF ERROR II

**{¶48}** In her second assignment of error, while appellant acknowledges that the trial court recited the necessary statutory language on the record and in the sentencing entry, she asserts that the record does not support the findings. The State counters that the trial court conducted a proper, thorough hearing and weighed all the statutory factors considering the principles and purposes of felony sentencing pursuant to R.C. 2929.11. The State also asserts that the sentence imposed was well within the statutory range and not a maximum sentence. Further, the State points out that appellant offered minimal mitigation at sentencing, showing no remorse, and took no responsibility for her role in the crimes.

### Standard of Review

**{¶49}** When reviewing felony sentences, appellate courts apply the standard set forth in R.C. 2953.08(G)(2). *State v. Spencer*, 2024-Ohio-59, ¶ 13 (4th Dist.). *See e.g.*, *State v. Nelson*, 2023-Ohio-3566, ¶ 63 (4th Dist.). R.C. 2953.08(G)(2)(a) provides that "[t]he appellate court's standard for review is not whether the sentencing court abused its discretion." Instead, the statute authorizes appellate courts to "increase, reduce, or otherwise modify a sentence" "if it clearly and convincingly finds either of the following:"

> (a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division

(B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;

(b) That the sentence is otherwise contrary to law.

{¶50} The Supreme Court of Ohio has recognized that R.C. 2953.08(G)(2) means that appellate courts ordinarily " 'defer to trial courts' broad discretion in making sentencing decisions.' " *State v. Gwynne*, 2023-Ohio-3851, ¶ 11, quoting *State v. Rahab*, 2017-Ohio-1401, ¶ 10; *see also State v. Marcum*, 2016-Ohio-1002, ¶ 23 (appellate court's review of whether sentence is clearly and convincingly contrary to law under R.C. 2953.08(G) is deferential to sentencing court); *State v. Collins*, 2024-Ohio-2891, ¶ 22 (4th Dist.).  Thus, R.C. 2953.08(G)(2) provides that an appellate court may increase, reduce, or otherwise modify consecutive sentences only if the record does not "clearly and convincingly" support the trial court's R.C. 2929.14(C)(4) consecutive-sentence findings.  The clear-and-convincing standard for appellate review in R.C. 2953.08(G)(2) is written in the negative.  *Gwynne*, supra, at ¶ 13.  Moreover, "clear and convincing evidence" is "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

**{¶51}** In general, a statutory presumption exists in favor of concurrent sentences pursuant to R.C. 2929.41(A) and R.C. 2929.14(C)(4) governs the imposition of consecutive terms of imprisonment. *Collins*, *supra*, at ¶ 23. To justify the imposition of consecutive terms of imprisonment, "a trial court must make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, but the court has no obligation to state reasons to support its findings." *State v. Blair*, 2019-Ohio-2768 ¶ 52 (4th Dist.), citing *State v. Bonnell*, 2014-Ohio-3177, syllabus. This Court has explained the findings required to support the imposition of consecutive sentences as follows:

> Under the tripartite procedure set forth in R.C. 2929.14(C)(4), prior to imposing consecutive sentences a trial court must find that: (1) consecutive sentences are necessary to protect the public from future crime or to punish the offender; (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) that one of three circumstances specified in the statute applies.

(Emphasis added.) *Cottrill* at ¶ 14, and *Collins* at ¶ 24, quoting R.C. 2929.14(C)(4)(a)-(c).

**{¶52}** Further, as we outlined in *Cottrill*, and more recently in *Collins*, the three circumstances are:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

*Cottrill* at ¶ 14, and *Collins* at ¶ 24, quoting R.C. 2929.14(C)(4)(a)-(c).

{¶53} The record must support any findings that the applicable statutory sentencing provisions require and that are made by the sentencing court, such as those contained in R.C. 2929.14(C)(4)(c). *State v. Gray,* 2019-Ohio-5317, ¶ 21 (4th Dist.); *State v. Drummond,* 2024-Ohio-81, ¶ 11 (4th Dist.). Further, in *Drummond* we observed that the plain language of R.C. 2953.08(G)(2) requires an appellate court to defer to a trial court's consecutive-sentence findings, and to uphold the trial court's findings unless those findings are clearly and convincingly not supported by the record. *Drummond* at ¶ 12. In *State v. Bonnell,* 2014-Ohio-3177, the Supreme Court of Ohio held, "In order to impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry[.]" *Id.* at ¶ 37.

{¶54} Here, it is undisputed that the trial court included the necessary findings under R.C. 2929.14 (C)(4) to support the imposition of appellant's consecutive sentences at the sentencing hearing and in the sentencing entry. The trial court stated:

> The Court further finds that consecutive sentences are necessary to protect the public from future crime or to punish the offender and are not disproportionate to the seriousness of the offenders conduct and to the danger the offender poses to the public, that at least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the course of conduct adequately reflects the seriousness of the offender's conduct, and further finds that the defendants criminal history shows that consecutive terms are needed to protect the public from future crime by the defendant.

Nevertheless, appellant argues that the following findings are not supported by the record: 1) consecutive sentences were necessary to protect the public; 2) consecutive sentences rendered the sentence disproportionate to the seriousness of her conduct and the danger she posed to the public; and 3) the harm caused by multiple offenses were not so great or unusual to justify consecutive sentences.

{¶55} First, she asserts that the consecutive sentences were not necessary to protect the public because she was not a principal offender since the evidence demonstrates that other individuals, and not appellant, were distributing drugs from the home. The record does support this finding, however, because the task force members testified that the drug trade occurs in some instances where dealers from

a source city seek out a target in a destination city to sell drugs. The fact that appellant opened her residence and agreed to receive a benefit from doing so resulted in a large amount of drugs being introduced into the region. Further, as the State argued at sentencing, more than one individual was using the residence for distribution (not just Lewis) and a substantial amount of narcotics were being trafficked there. Witnesses described the residence as a "trap house" or "convenience store" for drug sales. We also observed that the amount of packaging material and drugs were not just found throughout the home but were directly tied to appellant.

{¶56} Second, appellant argues that the trial court's finding that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, suggesting a more appropriate sentence would have been to run the offenses concurrently for a five to seven and a half-year prison sentence. Again, she cites the fact she only aided and abetted and was not the principal offender. In addition, although she admits that the offenses were committed as part of a course of conduct, since the drugs were all found at the same time during the execution of the search warrant, she claims the harm was not so great or unusual to justify consecutive sentences. In so doing, she argues that single prison term would have adequately reflected the seriousness of her

conduct. To support this claim, she primarily points to the fact that all the narcotics were found in the same general area.

{¶57} Contrary to these arguments, the record reflects that multiple types of drugs were being sold from the residence. Although most of the drugs were found at the same time, there was abundant evidence that transactions at the residence occurred on multiple days with multiple users and in the space of a few hours in the morning two drug users had already stopped by to purchase drugs. For example, in her statement appellant indicated that Lewis was giving out "testers" or samples of the product to build clientele in the Scioto County area. The trial court could glean from this fact that appellant's actions resulted in significant harm to the community and her culpability was more serious than someone who merely assisted one or two isolated buys of lesser amounts of drugs.

{¶58} Third, appellant disputes that her history of criminal conduct demonstrates the need for consecutive sentences because even though she has been to prison before, the majority of her offenses consists of misdemeanors. Her trial counsel argued below that appellant attended Maryhaven detox, and that her last conviction was in 2008. However, the record reflects that appellant had served five years in prison after violating community control and had multiple prior misdemeanors. Further, the record shows that pending the proceedings appellant tested positive on more than one occasion for controlled substances, even though

she denied that she would test positive. The trial court likely acknowledged the State's position that appellant refused treatment and her actions show she had no remorse.

**{¶59}** Based on the foregoing, we cannot find that the trial court's sentence is clearly and convincingly unsupported by the record. Furthermore, we cannot find that the record clearly and convincingly shows that appellant's sentence is contrary to law. Accordingly, we overrule the second assignment of error.

**{¶60}** Having found no merit to either of appellant's assignments of error, the judgment of the trial court is affirmed.

**JUDGMENT AFFIRMED.**

## JUDGMENT ENTRY

It is ordered that the **JUDGMENT IS AFFIRMED** and appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.

<u>IF</u> A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the 45- day appeal period set forth in the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. and Wilkin, J. concur in Judgment and Opinion.

For the Court,

_____
Jason P. Smith
Presiding Judge

## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 22, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**